Conda H. WYLIE and Edna O. Wylie, Independent Executors of the Estate of Mrs. J. F. (Nettie) Currie, Deceased, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 6–132.

United States District Court
N. D. Texas,
San Angelo Division.

Feb. 16, 1968.

Arch B. Gilbert and A. E. Brooks, Fort Worth, Tex., for plaintiffs.

John O. Jones, Tax Division, Dept. of Justice, Fort Worth, Tex., for defendant.

ESTES, Chief Judge.

After due notice to the parties, this cause came on for trial before this Court, sitting without a jury in San Angelo, Texas, on December 11 and 12, 1967. After considering the evidence and the arguments of counsel, the Court makes and enters the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Upon joint motion filed by the parties herein, this action was consolidated for trial with the cases styled Conda H. Wylie and Edna O. Wylie v. United States, Civil No. CA–6–131 and Edmund L. Richards and Maurine W. Richards v. Ellis Campbell, Jr., District Director of Internal Revenue, Dallas, Texas, Civil No. CA–6–133. The parties having heretofore filed a stipulation of facts, the Court finds that the facts so stipulated therein are true and correct.

2. This is a civil action arising under the laws of the United States of America providing for the internal revenue and is brought by the plaintiffs for the recovery of assessed and paid federal income taxes and interest for the years 1959, 1960, 1961, 1962, 1963, 1964, and 1965, in the sum of $817,527.65, plus statutory interest.

3. The plaintiffs herein are Conda H. Wylie and his wife, Edna O. Wylie, who reside (now and at all times pertinent did reside) on a ranch located in Coke County, Texas. Mrs. J. F. (Nettie) Currie died testate on July 25, 1957, while a resident of Runnels County, Texas. Mrs. Currie's last will and testament was duly admitted to probate in Cause No. 2845 in the County Court, Runnels County, Texas, and Conda H. Wylie and Edna O. Wylie were duly appointed and, at all times here pertinent, were the acting independent executors of Mrs. Currie's estate. The defendant, United States of America, is a corporation, sovereign and body politic.

4. One of the principal issues involved in this case, as well as in Civil Action Nos. CA–6–131 and CA–6–133, concerns the ownership interest of the estate of Mrs. J. F. (Nettie) Currie, Conda H. Wylie, Edna O. Wylie, Edmund L. Richards and Maurine W. Richards, in a unitized oil field known as the Fort Chadbourne Odom Lime Unit. As of the date of her death, Mrs. Currie owned a .05055 interest in the Fort Chadbourne Odom Lime Unit.

5. Conda H. and Edna O. Wylie, in their capacity as independent executors of the estate of Mrs. J. F. (Nettie) Currie, deceased, timely filed with defendant a federal estate tax return (Form 706) for the estate, reporting thereon items entering into the computation of dece-

dent's gross estate and deductions therefrom. Federal estate taxes in the sum of $1,383,646.92 were paid in connection with the filing of the estate tax return. The fair market value of Mrs. Currie's .05055 interest in the Fort Chadbourne Odom Lime Unit as of the date of her death was reported on the return to be $2,034,661. Upon audit of the federal estate tax return, the value placed on the .05055 interest was accepted by defendant without change.

6. Conda H. Wylie and Edna O. Wylie, in their capacity as independent executors of the estate of Mrs. J. F. (Nettie) Currie, timely filed with defendant, United States, Fiduciary Income Tax Returns (Forms 1041) for each of the estate's tax years 1959, 1960, 1961, 1962, 1963, 1964, and 1965, reporting thereon items entering into the computation of taxable income for the estate for each of those respective years. The returns reported taxable income and net income tax due as follows:

| Year | Taxable Income | Net Income Tax |
|------|---------------|----------------|
| 1959 | $ 26,971.79 | $11,200.51 |
| 1960 | 40,023.36 | 19,614.12 |
| 1961 | 39,561.93 | 19,295.73 |
| 1962 | 34,101.52 | 15,683.99 |
| 1963 | 49,993.65 | 26,673.43 |
| 1964 | 121,097.18 | 75,409.34 |
| 1965 | 73,058.52 | 37,208.62 |

The reported income tax, as reflected on each of the Fiduciary Income Tax Returns for each of the years 1959 through 1965, was timely paid.

7. Upon examination by defendant of the estate's Fiduciary Income Tax Returns, deficiencies in tax and interest for the years 1959, 1960, 1961, 1962, and 1963 were determined by defendant as follows:

| Year | Determined Taxable Income | Determined Net Income Tax | Determined Deficiency | Determined Interest |
|------|--------------------------|---------------------------|----------------------|---------------------|
| 1959 | $ 54,377.42 | $ 29,961.07 | $ 18,760.56 | $ 5,626.88 |
| 1960 | 215,226.70 | 170,534.30 | 150,920.18 | 36,210.50 |
| 1961 | 212,865.59 | 168,385.69 | 149,089.96 | 26,825.98 |
| 1962 | 199,398.50 | 156,136.65 | 140,452.66 | 16,844.70 |
| 1963 | 146,585.87 | 108,639.42 | 81,965.99 | 14,122.74 |
| Totals | | | $541,189.35 | $99,630.80 |

8. On April 14, 1965, Conda H. Wylie and Edna O. Wylie, independent executors of the estate of Mrs. J. F. (Nettie) Currie, paid to defendant the sum of $459,223.36 in payment of the determined deficiencies for the years 1959, 1960, 1961, and 1962. On May 6, 1965, the independent executors paid the interest on the determined deficiencies for the years 1959 through 1962 in the amount of $85,508.06. On March 1, 1967, the independent executors paid the determined deficiency in tax and interest for the year 1963.

9. The Currie and Wylie Oil Account Partnership was established in 1953, and income and expenses attributable to the Fort Chadbourne Odom Lime Unit and other units in which members of the family of Mrs. J. F. (Nettie) Currie owned interests were reported for federal tax purposes on partnership information returns. When Mrs. Currie died in 1957, the partnership elected to continue its operations by regarding the estate of Mrs. Currie as a partner. The partners in the Currie and Wylie Oil Account were Conda H. Wylie (25%), Edna O. Wylie (37½%), and the estate of Mrs. J. F. (Nettie) Currie (37½%).

10. The adjustments, which were made by the defendant to the fiduciary income tax returns filed for the estate of Mrs. J. F. (Nettie) Currie for the

years 1959, 1960, 1961, 1962, and 1963, were made because it was determined by defendant that the estate received additional partnership income from the Currie and Wylie Oil Account Partnership and because it was further determined that distributions from the estate to Mrs. Maurine Richards, beneficiary, had been understated. These adjustments were as follows:

| Year | Additional Oil Income | Understated Distributions |
|------|----------------------|---------------------------|
| 1959 | $ 37,477.55 | $10,071.92 |
| 1960 | 199,292.59 | 24,089.25 |
| 1961 | 195,325.49 | 22,021.83 |
| 1962 | 189,006.51 | 22,845.76 |
| 1963 | 96,592.22 | –0– |

11. The adjustments which were made by defendant to the income of the Currie and Wylie Oil Account Partnership for the years 1959, 1960, 1961, 1962, and 1963 were attributable to adjustments made to the depletion deductions claimed for such years. The depletion deductions claimed for such years, the depletion deductions as adjusted by the defendant, and the effect of such adjustments are as follows:

| Year | Depletion Deduction Claimed | Adjusted Depletion Deduction | Decrease in Depletion Allowed |
|------|------------------------------|-------------------------------|-------------------------------|
| 1959 | $421,972.65 | $384,495.10 | $ 37,477.55 |
| 1960 | 343,428.31 | 144,135.72 | 199,292.59 |
| 1961 | 331,228.18 | 135,902.69 | 195,325.49 |
| 1962 | 317,222.89 | 128,216.38 | 189,006.51 |
| 1963 | 175,247.06 | 78,654.84 | 96,592.22 |

12. The defendant also determined that the estate of Mrs. J. F. (Nettie) Currie was not in administration during the years 1961, 1962, and 1963 for federal tax purposes, and it treated the estate's income as having been distributed to the beneficiaries of the estate and taxable to them. As a result, the defendant made duplicate protective assessments of taxes and interest against the estate of Mrs. J. F. (Nettie) Currie and the beneficiaries thereof for the years 1961, 1962, and 1963. This was done by treating the income of the estate as being taxable to the estate and taxing the same, and treating the same income as having been distributed to the beneficiaries, on the other hand, and taxing it to them. The defendant determined that the estate was closed for the years 1964 and 1965. No additional assessments of tax and interest were made against the estate for the years 1964 and 1965, although, as of the time of the trial of this cause, defendant had not refunded any of the federal income tax that was paid by the estate for such years.

13. After the additional tax and interest were determined and assessed by defendant as above noted, and paid by plaintiffs in their capacity as independent executors of the estate of Mrs. J. F. (Nettie) Currie, claims for refund were timely filed for the estate by the plaintiffs, in their capacity as independent

executors, wherein they sought a refund of the tax and interest assessed and paid by them for the estate for the years 1961 through 1965. The claims for refund for the years 1961, 1962, and 1963 were in the alternative, in the event that it be held by the Court that the estate of Mrs. J. F. (Nettie) Currie was not in administration for the applicable years. The claims for refund for the years 1964 and 1965 were filed in the event that the estate of Mrs. J. F. (Nettie) Currie was held by the Court not to have been in administration during the years 1964 and 1965 or either of those years. Each of the claims for refund was duly considered and disallowed by defendant and this suit was, thereafter, timely filed. Conda H. Wylie and Edna O. Wylie, independent executors of the estate of Mrs. J. F. (Nettie) Currie, have made no assignment of any of the claims herein asserted by them, nor any part thereof, nor any interest therein. The plaintiffs represent the only parties interested in and entitled to recover under these claims.

14. As is above noted, one of the principal issues involved in this case, as well as in Civil Action Nos. CA–6–131 and CA–6–133, concerns the evolution and development of oil and natural gas activities in the field located in Runnels and Coke Counties, Texas, known as the Fort Chadbourne Field. Oil was discovered in the Fort Chadbourne Field and production therefrom began in 1949, with more and more wells being brought in through the year 1952, after the field developed. The wells in this field had what is known as a very high oil-gas ratio. This oil-gas ratio was so high that by 1952, more natural gas was being produced from the wells located therein than was oil. As a result, and because there was no existing market for gas in the area at that time, the natural gas that was being produced by these wells was being flared, or burned in the field.

As a result of this flaring of gas in the field, the Texas Railroad Commission issued an order directing that all production from the field should cease as of the close of the year 1952, and pursuant to this order, no oil was produced from the field during the year 1953. To reduce the wasting of natural gas, the owners of mineral interests in the Fort Chadbourne Odom Lime Field formed the Fort Chadbourne Odom Lime Unit by a Unitization Agreement and a Unit Operating Agreement, each executed on May 18, 1953. Humble Oil & Refining Company was designated by the working interest owners as Unit Operator.

15. Prior to 1953, Mrs. J. F. (Nettie) Currie, Conda H. Wylie, Edna O. Wylie, Edmund L. Richards, and Maurine Richards were owners of interests in the oil and gas properties located in the Fort Chadbourne Unit. On or about June 13, 1953, Mrs. J. F. (Nettie) Currie entered into an agreement with the Humble Oil & Refining Company, whereby she exchanged her interest as an owner of a working interest for a royalty interest, said agreement providing in part as follows:

> Insofar as the well and lease equipment conveyed hereby is concerned, it is agreed that the title to such lease and well equipment shall likewise remain vested in the grantee so long and only so long as the above described agreements remain in effect; but if and when said agreements have been in effect for a period of seven years, then the reversion of title to grantors in said lease and well equipment shall not occur and shall be conditioned upon grantor's paying grantee the salvage value of all such equipment, less the cost of salvaging same.

16. At the time that the Fort Chadbourne Field was unitized, the Engineering and Geological Committee of the Fort Chadbourne Odom Lime Unit Working Interest Owners, including Humble Oil & Refining Company as the Unit Operator, was formed, and this Engineering and Geological Committee estimated that the total ultimate recoverable reserves from the unitized field would be 41.6 million barrels of oil. In August of 1953, the unit commenced a pressure maintenance program consisting of peripheral water and gas injection into the Unit.

17. As is above noted, the estate tax return filed for the estate of Mrs. J. F. (Nettie) Currie valued her .05055 interest in the Fort Chadbourne Odom Lime Unit at $2,034,661, as of the date of her death. The value of Mrs. Currie's interest in the Unit was based upon an engineering report prepared for the independent executors by Mr. Leo Fry, dated September 30, 1958. Mr. Fry had been a member of the Engineering and Geological Committee from the time it was formed and was a member during all of the years here involved. In his report, the total ultimate recoverable reserves from the Unit was estimated to be 40,702,077 barrels of oil, some 897,223 barrels less than had been estimated by the Engineering and Geological Committee.

18. On March 11, 1960, the operating committee of the Fort Chadbourne Odom Lime Unit held a meeting at Wichita Falls, Texas, during which the results obtained from previous operations and plans for future operations were discussed. It was the Unit Operator's opinion that some change should be made in the future operations of the Unit, and, further, that the operating committee's previous estimate of 41.6 million barrels of oil as the total estimated recoverable reserves should be increased by between some 10 and 15 million barrels of oil, depending upon the decision of the operating committee as to which method of secondary recovery operations was to be employed in the future. Another meeting of the operating committee was held on April 11, 1960, whereat the committee approved a full-scale water-flood program to be adopted and put into operation on the Unit, based upon the Unit Operator's estimate that such a program would increase the ultimate recoverable reserves to 51.6 million barrels of oil.

19. In computing and reporting the federal income tax liabilities for the estate of Mrs. J. F. (Nettie) Currie for the years 1959, 1960, 1961, 1962, and 1963, the estate claimed deductions for cost depletion under Section 611(a) of the Internal Revenue Code of 1954, on the basis of 84.75 percent of income. In so doing, the estate used a total estimated recoverable reserves of 40.7 million barrels of oil as reflected by Mr. Fry's report, rather than the 41.6 million barrels as estimated in 1953 by the unit's operating committee. The defendant's adjustments respecting the cost depletion deduction claimed by the estate for the year 1959 were made because defendant determined that the estimated ultimate recoverable reserves from the Unit that should have been used by the estate in computing the cost depletion deduction for that year was the estimate of the operating committee of 41.6 million barrels of oil, rather than 40.7 million barrels of oil that was actually used. Defendant's adjustments respecting the cost depletion deduction claimed by the estate for the years 1960 through 1963 were made because it was determined by defendant that the cost depletion deduction claimed by the estate for those years should have been calculated by using the revised estimate of 51.6 million barrels of oil made by the operating committee on April 11, 1960, rather than 40.7 million barrels of oil that was actually used.

20. The adjustments made by the defendant were to the income of the Currie and Wylie Account Partnership for the years 1959 through 1963, which were attributable to adjustments made to the depletion deductions for those years. The defendant also determined that the estate of Mrs. J. F. (Nettie) Currie was not in administration for federal tax purposes during the years 1961 through 1963 and, as a result, the estate's income was treated as having been distributed to the beneficiaries of the estate and taxable to them, as above noted.

21. Mr. Fry was a member of the Engineering and Geological Committee which had studied the Odom Limestone formation for many years. Using the information and data available to the Engineering and Geological Committee, in 1953, the operating committee estimated that the total ultimate recoverable reserves from the unit would be 41.6 million barrels of oil. The composite infor-

mation of the Engineering and Geological Committee was available to Mr. Fry. Yet, Mr. Fry's estimate was lower than that of the operating committee. The Court finds that Mr. Fry's estimate was arbitrary and unreasonable. At the date of Mrs. Currie's death, the operating committee's 1953 estimate of 41.6 million barrels of oil was the most reasonable and reliable estimate that was available. Thus, at the date of Mrs. Currie's death, the most reasonable and reliable estimate of the total ultimate recoverable reserves from the unit at the date of her death was 41.6 million barrels of oil less the number of barrels actually produced between the date of the 1953 estimate and the date of death, or 17,050,144 barrels of oil.

22. As above noted, at the meeting of the Fort Chadbourne Odom Lime Unit Working Interest Owners held on April 11, 1960, a full-scale water-flood program was adopted, based upon the unit operator's estimate that the total ultimate recoverable reserves from the unit under such a program would be 51.6 million barrels of oil. However, it was not until during the year 1963, that it was ascertained, as a result of the full-scale water-flood operations, that the recoverable units were greater than the prior estimate of 41.6 million barrels of oil. During the year 1963, increased royalties paid to the plaintiffs in this suit, as well as public knowledge, indicated that the total estimated recoverable reserves from the unit were greater than the prior estimate of 41.6 million barrels of oil.

23. On May 9, 1952, a lawsuit was filed by Wanda Hanks, Cause No. 60,921, in the District Court of Runnels County, Texas, 119th Judicial District, against Bascom Giles, Commissioner of the General Land Office, and others, including Nettie Odom Currie. This lawsuit was still pending at the time of the trial of these consolidated actions. This is a lawsuit for the recovery of certain property located in and contributed by the involved defendants therein to the Fort Chadbourne Odom Lime Unit, and for damages against the executors of the estate of Mrs. J. F. (Nettie) Currie for the withdrawal of oil from the land. On or about August 5, 1964, Wanda Hanks offered to settle this case for $150,000 cash.

24. The agreement of June 13, 1953, between Humble Oil & Refining Company and Mrs. J. F. (Nettie) Currie, as above described, provided that under certain circumstances she was to be able to acquire title to some of the salvage equipment used in connection with the unit. During the years involved, the estate of Mrs. J. F. (Nettie) Currie was involved in a controversy with Humble Oil & Refining Company concerning her rights under this contract to repurchase such equipment for its salvage value. This controversy did not involve just the amount of money that was involved there; this controversy involved the question concerning all of the equipment located in the Fort Chadbourne Odom Lime Unit.

25. During the tax years here involved, a controversy also existed between the executors of the estate of Mrs. J. F. (Nettie) Currie and Maurine W. Richards, one of the beneficiaries of the estate, concerning the interest of such beneficiary in the estate.

26. During the years 1962 and 1963, the estate of Mrs. J. F. (Nettie) Currie was involved in resolving certain title problems in connection with properties owned by the estate contributed to the Fort Chadbourne Odom Lime Unit.

27. During March of 1963, defendant, through its agents, commenced examination of the fiduciary income tax returns filed for the estate of Mrs. J. F. (Nettie) Currie.

28. The estate of Mrs. J. F. (Nettie) Currie was in the process of administration and settlement during all of the taxable years here involved, and was still in administration at the time of the trial of these consolidated actions. The income of the estate of Mrs. J. F. (Nettie) Currie during the taxable years 1961, 1962, 1963, 1964, and 1965, was not cur-

rently distributable to the plaintiffs and, in fact, none was distributed to them.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and of the subject matter of this action.

2. Section 611(a), Internal Revenue Code of 1954, provides as follows:

### SEC. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION.

(a) *General rule.*—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. For purposes of this part, the term "mines" includes deposits of waste or residue, the extraction of ores or minerals from which is treated as mining under section 613(c). In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this section for subsequent taxable years shall be based on such revised estimate.

\* \* \* \* \* \*

(26 U.S.C. 1964 ed., Sec. 611.)

■ 3. As the Court has previously noted, for the year 1959, the estate claimed cost depletion based upon 84.75 percent of gross income. In so doing, the estate relied upon and used Mr. Fry's 1958 estimate of the total ultimate recoverable reserves in the unit. The defendant's action in disallowing a portion of the depletion deduction claimed for the year 1959 was based upon its contention that the representatives of the estate had knowledge, prior to 1959, that Mr. Fry's estimate, which was made in 1958, did not agree with the operating committee's

1953 estimate and, further, the 1953 estimate should have been used by the representatives of the estate in calculating the estate's cost depletion deduction for the year 1959. As we have previously said, the estimate of the total ultimate recoverable reserves to be produced from the unit, which was made by the operating committee in 1953, was the most reasonable and reliable estimate that was available at the date of Mrs. Currie's death. This is the estimate that should have been used by the representatives of the estate in computing the cost depletion deduction for the year 1959, rather than Mr. Fry's estimate. Thus, the adjustments made by the defendant to the cost depletion deduction claimed by the estate for the year 1959 are correct and proper.

4. For the years 1960, 1961, 1962, and 1963, the estate claimed deductions for cost depletion, again using as a basis therefor the estimate of total ultimate recoverable reserves prepared by Mr. Fry in 1958. Defendant again disallowed portions of the claimed cost depletion deduction for each of the years 1960 through 1963. Defendant contends that the representatives of the estate should have used the operating committee's revised estimate of 51.6 million barrels of oil which was made in 1960, and its adjustments to the claimed cost depletion deduction for each of the years 1960 through 1963 were made accordingly.

■ The evidence has shown that the estimate of the operating committee of 51.6 million recoverable units of oil was made on April 11, 1960, but that it was not until the year 1963 that it was ascertained as a result of the full-scale water-flood operation, development on the land itself, and increased royalty payments to the plaintiffs, individually and in their capacity as representatives of Mrs. Currie's estate, that the recoverable units were greater than the prior estimate of 41.6 million barrels. This being the case, the Court is of the opinion that, for the tax years 1960, 1961, and 1962, the proper estimate of the total ultimate recoverable units of oil that should have

been used by the representatives of the estate in calculating the estate's cost depletion deduction for each of those years, was the 41.6 million barrel estimate made by the operating committee in 1953. Cost depletion adjustments should be made accordingly.

5. Plaintiffs also contend that they were not required to use the operating committee's 1960 revised estimate of 51.6 million barrels in computing the estate's cost depletion deduction for the tax year 1963. They claim that prior to the year 1963, they had no actual or constructive knowledge of and, therefore, did not ascertain that the number of recoverable units was greater than the prior estimate which they relied upon in computing the estate's cost depletion deduction for 1963. They claim that even though they became aware of the fact that the estimated reserves were greater in 1963, the statute itself [Section 611(a) of the Internal Revenue Code of 1954] provides that no revision is necessary until a year subsequent to the taxable year in which the knowledge was obtained.

While a narrow reading of the statute might tend to lend support to the plaintiffs' position, the Treasury Regulations on Income Tax (1954 Code), Sec. 1.611–2(c) (2), take the approach that the revised estimate will be used for the taxable year in which the facts are discovered and for subsequent taxable years. The applicable Regulations provide as follows:

Sec. 1.611–2 *Rules applicable to mines, oil and gas wells, and other natural deposits.*

\* \* \* \* \* \*

(c) *Determination of mineral contents of deposits.*

\* \* \* \* \* \*

(2) If the number of recoverable units of mineral in the deposit has been previously estimated for the prior year or years, and if there has been no known change in the facts upon which the prior estimate was based, the number of recoverable units of mineral in the deposit as of the taxable year will be the number remaining from the prior estimate. However, for any taxable year for which it is ascertained either by the taxpayer or the district director from any source, such as operations or development work prior to the close of the taxable year, that the remaining recoverable mineral units as of the taxable year are materially greater or less than the number remaining from the prior estimate, then the estimate of the remaining recoverable units shall be revised, and the annual cost depletion allowance with respect to the property for the taxable year and for subsequent taxable years will be based upon the revised estimate until a change in the facts requires another revision. Such revised estimate will not, however, change the adjusted basis for depletion.

\* \* \* \* \* \*

(26 C.F.R., Sec. 1.611–2.)

The Treasury Regulations have taken the approach that the revised estimate will be used for the taxable year in which the facts are discovered and for subsequent taxable years since 1941.[1] Thus, the reenactment of the statute by Congress, and its failure to amend the statute in the face of the administrative construction thereof, is indicative of recognition and approval of the statute as construed. See McCaughn v. Hershey

---

1. The Treasury Regulations under the Revenue Act of 1932 (Regs. 77, Article 229) provide that the revised estimate will be used in computing the depletion allowance for subsequent taxable years. The current position of the Treasury Regulations was adopted in 1941 when T.D. 5054, 1941–1 Cum.Bull. 227, amend-

ed Regs. 103, Section 19.23(m)–9, to provide that the revised estimate would be used for the year in which it is ascertained that the recoverable units are greater or less than the number remaining from the prior estimate and for subsequent years.

Chocolate Co., 283 U.S. 488, 51 S.Ct. 510, 75 L.Ed. 1183 (1931).

6. The statutory provision in question [Section 611(a), Internal Revenue Code of 1954] originally came into law as a part of the Revenue Act of 1932. The legislative history, insofar as here pertinent, provides as follows (S.Rep. No. 665, 72d Cong., 1st Sess. [1939–1 Cum.Bull. (Part 2) 496]:

> The House bill requires a change in the annual depletion allowance where a new estimate of the number of the recoverable units is made in the light of subsequent events. The effect of the amendment is shown by the following example:

> A purchased for $1,000 an ore body with estimated recoverable units of 1,000. He removes 500 units and takes depletion deductions aggregating one-half of his cost, or $500. Subsequently, it is ascertained that there remain in the mine 1,500 recoverable units and the original estimate of 1,000 recoverable units is revised. Under the amendment, his unrecovered cost ($1,000 less $500) would be spread over the revised estimate of the recoverable units (1,500) with the result that on each unit thereafter removed he would be allowed a depletion deduction of 33⅓ cents per unit instead of $1 per unit.

Some insight to the meaning of the phrase "subsequent taxable years" is furnished by the case law prior to the 1932 amendment. The issue in those cases was whether subsequently discovered facts resulted in a change in the estimate of the number of recoverable units so that it could be retroactively applied to revise the depletion taken in prior years. The courts generally held that the right to revise could not be retroactively applied. See, e. g., Sterling Coal Co. v. Commissioner, 8 B.T.A. 549 (1927); Philadelphia Quartz Co. v. Commissioner, 13 B.T.A. 1146 (1928); Kehota Mining Co. v. Lewellyn, 28 F.2d 995

(W.D.Pa., 1928), affirmed 30 F.2d 817 (C.A.3d, 1949). The courts also generally have held that subsequently discovered facts could properly be employed to revise the basis for the computation of depletion for the year in which the facts were discovered. See Stouts Mountain Coal Co. v. Commissioner, 4 B.T.A. 1292 (1926).[2]

7. The Court concludes that the estimate of recoverable reserves from the Fort Chadbourne Odom Lime Unit should have been changed by the plaintiffs in and for the purpose of computing the estate's cost depletion deduction for the taxable year 1963 because it was in that year that it was ascertained, within the meaning of Section 611(a) of the Internal Revenue Code of 1954, as a result of operations and development that the recoverable units were some 10 million barrels greater than the prior estimate.

8. Under Section 641(a) (3), Internal Revenue Code of 1954, a tax is imposed upon the income received by an estate during the period of administration or settlement of the estate. The period of administration or settlement for federal tax purposes is the period that is actually required by the administrator or executor to fulfill the ordinary duties of administration, such as the collection of assets and the payment of debts, taxes, legacies and bequests. Treasury Regulations on Income Tax (1954 Code), Sec. 1.641(b)–3(a); Miller v. Commissioner of Internal Revenue, 333 F.2d 400 (C.A. 8th, 1964); Stewart v. Commissioner of Internal Revenue, 196 F.2d 397 (C.A. 5th, 1952). This holds true regardless of whether or not the period required is longer or shorter than the period specified under the applicable local law for settlement of estates. The period of administration cannot, however, be unduly prolonged and if such period is unreasonably prolonged, the estate is considered to be closed for federal income tax purposes after the expiration of a rea-

---

2. In a case pertaining to a year prior to 1932 but tried after the 1932 amendment, the court reached a similar conclusion. Big Four Oil & Gas Co. v. Commissioner, 28 B.T.A. 61 (1933), affirmed, 83 F.2d 891 (C.A.3d, 1936).

sonable period for the performance by the executor of all of the duties of administration. Treasury Regulations on Income Tax (1954 Code), Sec. 1.641 (b)–3(a); Helvering v. Winmill, 305 U.S. 79, 59 S.Ct. 45, 83 L.Ed. 52 (1938); Taft v. Commissioner of Internal Revenue, 304 U.S. 351, 58 S.Ct. 891, 82 L.Ed. 1393 (1938); Miller v. Commissioner of Internal Revenue, supra; Chick v. Commissioner of Internal Revenue, 166 F.2d 337 (C.A. 1st, 1948), certiorari denied, 334 U.S. 845, 68 S.Ct. 1514, 92 L.Ed. 1769 (1948).

■■■ 9. The question of whether the administration of an estate has been unduly prolonged is one of fact, depending upon the diligence of the administrator in discharging his duties and the reasonableness of his course of action. Stewart v. Commissioner of Internal Revenue, supra; McCauley v. United States, 193 F.Supp. 938 (E.D.Ark., 1961). See also 6 Mertens, Law of Federal Income Taxation, Sec. 36.47. Of course, the facts in a given case may be so clear that reasonable men could not differ on the question of whether the administration was or was not unduly prolonged, in which case, the question is one of law. It is clear that the continuation of administration of an estate after the federal estate taxes and estate inheritance taxes have been paid is not unreasonable when claims against the estate involving property comprising the estate are still unsettled. Brown v. Commissioner of Internal Revenue, 215 F.2d 697 (C.A. 5th, 1954), reversing in part, 19 T.C. 87 (1952); Frederich v. Commissioner of Internal Revenue, 145 F.2d 796, 157 A. L.R. 841 (C.A. 5th, 1944). This is especially true where the claims against the estate in proportion to the value of the estate are of considerable magnitude. McCauley v. United States, supra; Pe-

tersen v. Commissioner, 35 T.C. 962 (1961). See also Patton v. United States (N.D.Tex.), decided May 8, 1959 (59–1 U.S.T.C., par. 9459); Stephenson v. Commissioner, 33 B.T.A. 252 (1935). In the instant case, the evidence has shown that cash on hand in the estate at the date of death exceeded $1 million and the estate's debts were less than $30,000. The claims against the estate were nominal in comparison to its total value and there was no contest of Mrs. Currie's will. During the year 1960, all specific bequests had been made and the federal estate tax liability and estate inheritance tax liability had been satisfied. However, as the evidence has clearly indicated, the representatives of the estate have been involved in serious litigation concerning claims made against the assets of the estate, including the properties comprising the estate's interest in the Fort Chadbourne Odom Lime Unit, from the date of Mrs. Currie's death down to and including the date of this trial. The Court concludes that, for federal tax purposes, the estate of Mrs. J. F. (Nettie) Currie was not closed for the years 1961, 1962, 1963, 1964, and 1965, and the income therefrom was taxable to the estate and not to the beneficiaries thereof.

10. The income taxes and interest that were assessed against and collected from the plaintiffs by defendant which are inconsistent with the taxes which were properly and legally assessible and collectible from the plaintiffs were improper. The plaintiffs are entitled to recover those taxes and interest collected as a result of the adjustments at variance and inconsistent with the findings and conclusions reached herein.

11. Any finding of fact deemed to be a conclusion of law is hereby adopted as a conclusion of law.

Judgment will be entered accordingly.