KENNETH S. KIRSCH and MAVIS I. KIRSCH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kirsch v. Commissioner
Docket No. 2586-83.
United States Tax Court
T.C. Memo 1985-114; 1985 Tax Ct. Memo LEXIS 517; 49 T.C.M. (CCH) 952; T.C.M. (RIA) 85114; March 18, 1985. Alan L. Austin and J. Douglas Austin, for the petitioners. Mark A. Pridgeon, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge:* Respondent determined deficiencies in petitioners' 1978, 1979, and 1980 Federal income taxes in the amounts of $2,031, $2,197, and $4,593, respectively. The issues for decision are (1) whether a loss is realized when farmland is transferred in settlement of a state court lawsuit where ownership of the farmland is contested by the heir of an intestate decedent and the person who claims to have owned the farmland under a contract to make a will which decedent failed to make, and (2) whether the loss is recognizable under section 172 [1] as a net operating loss from any farming activity. We only need to decide the second issue if we find that a loss is realized. *521 FINDINGS OF FACT All of the facts have been stipulated and are found accordingly. The stipulation of facts, supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. Petitioners Kenneth S. Kirsch and his wife, Mavis I. Kirsch, [2] resided in El Segundo, California, at the time they filed their petition in this case. Petitioners filed joint Federal income tax returns for the years in question with the Internal Revenue Service Center in Fresno, California. The facts in this case revolve around a family dispute over the inheritance and ownership of some farmland in South Dakota. The Kirsch family, originally consisting of brothers Chris and Fred, owned land adjacent to each other, cooperated in farming with *522 each other, and used each other's equipment and land. When Chris' health began deteriorating, his son, Gene, took over farming with Fred, Gene's uncle, as Fred and Chris had done previously. To understand the persons involved in this case, references will be made. "Petitioner" will refer to Kenneth, who is Fred's son. "Decedent" will refer to Fred, who was petitioner's father. "Nephew" will refer to Gene, who is a cousin to petitioner and nephew of decedent. On December 8, 1975, decedent and nephew entered into a "Memorandum Agreement" whereby nephew agreed to farm certain farmland and give the crops raised thereon to decedent, who agreed to pay the expenses. The agreement also provided that upon decedent's death, the nephew would receive the land the nephew farmed, as compensation for the nephew's services. The agreement further provided that decedent would incorporate into a will that the land was to be given to the nephew upon decedent's death. [3]
*523 On August 7, 1976, decedent died intestate leaving petitioner his sole surviving heir and child. Petitioner was appointed administrator of decedent's estate. [4]
On September 7, 1976, the nephew began an action in South Dakota Circuit Court against decedent's estate and against petitioner, as administrator of the estate. Nephew sought specific performance of the Memorandum Agreement to enforce the agreement to make a will and alternatively sought fee title to the farmland in question. [5] The nephew's pleadings also alleged that the nephew had filed a claim against decedent's estate in the amount of $194,603.44 for expenses advanced on behalf of decedent and work done for the benefit of decedent's farming operation. [6]
*524 On October 6, 1976, petitioner in this case and nephew signed an agreement with respect to the farmland in question concerning arrangements for the farming of the disputed land until final resolution of the lawsuit pending in South Dakota Circuit Court. Petitioner filed an amended answer and counterclaim, with respect to the South Dakota lawsuit, generally denying all of the allegations made in the nephew's complaint and amended complaint and alleging that the nephew's claim was without merit. The amended answer alleged that decedent did not own certain farmland that decedent "allegedly" conveyed to the nephew (other than steel grain bins, a corn crib, and a cattle shed located on such farmland). [7] Petitioner also alleged that the nephew had already been compensated for his labor because the nephew received or converted to his own use the cattle, farm buildings, machinery, and grain, and further alleged that the Memorandum Agreement was induced by nephew's and nephew's father's undue influence on decedent. Petitioner's counterclaim in the state lawsuit sought the value of all the machinery, farm buildings, cattle, and grain that nephew had allegedly converted. Petitioner offered *525 proof that decedent paid for the property, had depreciated the farm buildings and machinery on his Federal income tax returns, and was record owner pursuant to the Codington County Board of Equalization. Petitioner also sought double the value of such property as authorized under state law for the alleged conversion of property. A Federal estate tax return of the estate of decedent, along with attachments, *526 was filed on approximately April 29, 1977, with the Internal Revenue Service Center at Ogden, Utah. The return reported the real estate owned by decedent at death. The fair market value of the north 10 acres of the southeast quarter of the northeast quarter of section 33 of the land was $7,500. [8] The north 25 acres of the southwest quarter of the northeast quarter of section 33 of the land was valued at $7,500. [9] The north half of the northeast quarter of section 33 of the land was valued at $28,000. [10] The 122 acres in the southwest quarter of section 22 of the land was valued at $51,850. The northwest quarter and the north half of the northeast quarter (including the abandoned railway right-of-way) of section 28 of the land was valued at $144,000. *527 Several controversies existed over the specific sections of the farmland that decedent owned or was alleged to have owned in order to convey to the nephew. First, with respect to section 22 of the land, the Memorandum Agreement specified that the nephew was to receive the southwest quarter of land (a quarter of land is 160 acres). The estate tax return included the quarter of land, less excepted portions, resulting in approximately 122 acres. The value of the 122 acres on the estate tax return was reported as $51,850. With respect to section 27 of the land, the Memorandum Agreement specified that the nephew was to receive the north half of the northwest quarter of land (i.e., 80 acres). The estate tax return did not include any farmland in this section of land. With respect to section 28 of the land, the Memorandum Agreement specified that the nephew was to receive both the northeast and northwest quarter of land (i.e., 320 acres). The estate tax return included the northwest quarter and only the north half of the northeast quarter of land (i.e., 240 acres). The value of the 240 acres of land, as stated on the Federal estate tax return, was $144,000. With respect to section *528 33 of the land, the Memorandum Agreement did not specify that the nephew was to receive any farmland in this section of land. The estate tax return included 115 acres in this section of land and valued at a total of $43,000 (i.e., $28,000 plus $7,500 plus $7,500). The estate tax return on Schedule G entitled "Transfers During Decedent's Life" included certain cattle and machinery, but noted that the ownership of such property was being contested in a pending action in state court. No deduction was taken for the nephew's claim of $194,603.44 on Schedule J of the estate tax return entitled "Funeral Expenses and Expenses Incurred in Administering Property Subject to Claims." However, a note to such schedule stated that such claim was in dispute in state court. [11]
*529 The estate filed Form 1041 (U.S. Fiduciary Income Tax Return) for fiscal year ended July 31, 1977, where, among other items being reported, deductions were claimed for depreciation on the farm buildings, interest on the farm mortgages, utility expenses, and real estate taxes. In addition, employment tax deductions were claimed for a farm employee other than the nephew and gains and losses were claimed from the sale of farm machinery, steers, sheep, gravel, and grain. The estate's Form 1041 was filed with the Internal Revenue Service Center at Ogden, Utah. The estate reported no net income for the 1977 fiscal year and reported a net operating loss of $1,833.10 for the 1978 fiscal year. On July 19, 1978, petitioner and the nephew reached an agreement in the lawsuit in South Dakota involving the farmland, cattle, grain, and machinery. The parties stipulated their agreement to settle the lawsuit upon certain terms. Pursuant to the agreement reached, petitioner placed an administrator's deed in escrow conveying good and merchantable title to the nephew with respect to the 122 acres in section 22 of the land and conveying title to the nephew of the 240 acres in section 28 of the land *530 once nephew paid petitioner $90,000 for such property. In addition, petitioner agreed to sell the nephew the 105 acres in the northeast quarter of section 33 of the land under a contract for deed for $44,000. [12] Petitioner was to be responsible for all of the real property taxes for the first half of 1977 that were due in 1978. Nephew was to dismiss his claim pending against the estate of decedent in the amount of approximately $194,600 and petitioner was to dismiss his counterclaim against the nephew for the cattle, grain, farm buildings, and machinery. *531 On his 1978 Federal income tax return, petitioner reported the sale of the farmland to the nephew for a total purchase price of $134,000 (i.e., $90,000 with respect to the administrator's deed property and $44,000 with respect to the contract-for-deed property). Petitioner reported the basis in the property sold as $231,350 (the valuation of the farmland as reported on the estate tax return minus the depreciation taken on the farm buildings). [13] In addition to reporting the net operating loss of the estate of $1,833.10 for fiscal year ended July 31, 1978, petitioner claimed a net operating loss of $94,950 with respect to the sale of the farmland (i.e., sales price of $134,000 minus $231,350 basis). By claiming the loss on his personal income tax return, petitioner offset all of his income in 1978, 1979, and 1980. [14]
*532 The Commissioner disallowed the net operating loss in 1978 and the net operating loss carry forwards in 1979 and 1980 stating that the fair market value of petitioner's interest in the disputed real estate was $134,000 instead of $231,350. Accordingly, the Commissioner disallowed petitioner's nonbusiness deductions in excess of the zero bracket amount because without the claimed nonbusiness deduction, petitioner's deductions did not exceed the zero bracket amount. OPINION The first issue for decision is whether petitioner realized a loss on the sale of the farmland from settlement of a lawsuit regarding the ownership of such property. Petitioner argues that his basis in the disputed farmland was $231,350, the value of the property appraised on the Federal estate tax return and the value upon which Federal estate tax was paid. Respondent argues, however, that petitioner's basis in the property was $134,000 so that no loss was realized from the sale of property for $134,000. Respondent's determination of petitioner's basis appears to be based on the price of the property agreed to by the parties to settle the lawsuit where ownership of the property was in dispute. *533 The basis of property acquired by inheritance is the fair market value at the time of such acquisition. Sec. 1014. The appraisal for Federal estate tax purposes of the value of the property as of the date of the decedent's death "shall be deemed to be its fair market value at the time of acquisition." Sec. 1.1014-3, Income Tax Regs. This regulation has been construed to mean that the value arrived at by such an evaluation is only prima facie correct and may be shown to be erroneous. Plaut v. Munford,188 F.2d 543 (2d Cir. 1951); Delone v. Commissioner,6 T.C. 1188 (1946); Carnrick v. Commissioner,21 B.T.A. 12 (1930). Respondent does not seek to rebut the prima facie proof of the total market value of the property based on the estate tax appraisal. Rather, respondent argues that the fair market value of petitioner's interest was only $134,000 of the $231,350 valuation placed on the property. Thus, respondent argues that petitioner was not the owner of the entire equitable interest in the disputed farmland. To determine the proper basis of *534 the property at issue, we must decide what are the interests of the parties involved. The nature of an individual's legal interest in property is a matter of state law. Burnet v. Harmel,287 U.S. 103, 110 (1932), and its progeny. Consequently, we must look to South Dakota law to determine whether the nephew acquired an interest in the farmland involved based on the signed agreement to make a will and leave the farmland to him. It has long been established under South Dakota law that a contract to make a will to dispose of specific property is enforceable. Beveridge v. Bailey,53 S.D. 98, 220 N.W. 462, rehearing 53 S.D. 381, 220 N.W. 868 (1928). See also, e.g., Neuharth v. Brunz,85 S.D. 267, 181 N.W.2d 92 (1970) (involving whether joint and mutual wills created a contract); Lass v. Erickson,74 S.D. 503, 54 N.W.2d 741, 742 (1952) (involving whether circuit court had jurisdiction to determine heirs based on a contract to make a will); In re Buss' Estate,71 S.D. 529, 26 N.W.2d 700, 702 (1947) *535 (involving whether children of a spouse to an antenuptial agreement are creditors or legatees notwithstanding a will leaving nothing to the spouse or her heirs); Dawson v. Corbett,71 S.D. 106, 21 N.W.2d 758, 760 (1946) (involving whether valuable consideration existed for the alleged contract to make a will); Lothrop v. Marble,12 S.D. 511, 81 N.W. 885, 886 (1900) (involving specific performance of an oral agreement to make a will); Quinn v. Quinn,5 S.D. 328, 58 N.W. 808, 811 (1894) (involving the validity of an agreement leaving all property to a child where the agreement was given to the child's mother to induce her to consent to the child's adoption). Contrary to respondent's assertion, it is not well settled under South Dakota law that the promisee of a contract to dispose of property in a certain way has an enforceable claim as a legatee rather than as a creditor. A legatee would have an enforceable interest in the property whereas a creditor merely would have a claim against the estate. We did not find any South Dakota law to conclude that the nephew's enforceable right was that of a legatee so that the nephew would *536 be presumed a partial owner of the farmland. Petitioner cites cases which, under South Dakota law, support the argument that the nephew has no interest in the specific farmland. S.D. Codified Laws Ann., sec. 29-1-2 (1976); [15]Porter v. Mad Bear,76 S.D. 408, 79 N.W.2d 443, 445 (1956); In re Smith's Estate,76 S.D. 11, 71 N.W.2d 577, 579 (1955); Federal Land Bank of Omaha v. Fjerestad,66 S.D. 429, 285 N.W. 298 (1939); In re Guider's Estate,63 S.D. 495, 260 N.W. 828 (1935); Stianson v. Stianson,40 S.D. 322, 167 N.W. 237 (1918); Jacquish v. Deming,40 S.D. 265, 167 N.W. 157 (1918); Carter v. Frahm,31 S.D. 379, 141 N.W. 370 (1913). If anything, the nephew may have a claim against the estate or decedent's heirs. Federal Land Bank of Omaha v. Fjerestad,supra at 299. It is clear that the South Dakota courts have control over the administration of an intestate decedent's estate until probate is ended. Lass v. Erickson,supra at 744; Carter v. Frahm,supra at 373. It is also clear that *537 South Dakota courts have equity jurisdiction to provide specific performance of an agreement to make a will. Lothrop v. Marble,supra at 886. Specific performance will not be granted, however, if it is possible to estimate the value of the services rendered ( Quinn v. Quinn,5 S.D. 328, 58 N.W. 808, 811 (1894)) and it would be inequitable to give the land to the promisee of the contract to make a will if, for example, an heir exists. Lothrop v. Marble,supra at 886. Because petitioner stood to inherit the property and the value of the services *538 nephew rendered to decedent had an ascertainable value, we believe that under South Dakota law the nephew would have only a claim against the estate for the value of the services rendered rather than any legal rights in the specific property. [16] As for petitioner, title to the specific farmland vested immediately in petitioner, as heir, subject only to the control of the county court for the purpose of administration. [17]Lass v. Erickson,supra at 744; Carter v. Frahm,supra at 373. In the normal situation, to satisfy claims against the estate where there are not enough liquid assets to pay the claims, the executor or administrator would sell the estate's assets to generate the money. Any money remaining after paying the claims against the estate would be distributed to the heirs. Thus petitioner, as sole heir to the estate, would be entitled, after the estate's administration, to the value of all the assets includable in decedent's gross estate less any claims against the estate. *539 Respondent further argues that the settlement agreement conclusively establishes that petitioner received the correct amount for the property. The settlement of the state court action determined the value of petitioner's interest and the competing nephew's claim to an interest in the disputed farmland. We agree. The lawsuit in South Dakota Circuit Court involved more than just the farmland involved in this case. While ownership of the farmland was at issue, so was ownership of the cattle, grain, farm buildings, and machinery of which the nephew was in possession as well as the value of the services rendered. Double damages for the conversion of property was also involved. Moreover, the nephew in the lawsuit sought specific performance of land decedent did not even own and agreed to settle with farmland that was not even mentioned in the contract to make a will. We have specific evidence that the farmland was valued at the date of death at $231,350 and we have specific evidence that the estate through petitioner received $134,000 cash plus other consideration from the agreement to settle the prolonged lawsuit out of court. The "other consideration" has not been delineated *540 and we are not able to specifically value it. We must and we do conclude that the value of the "other consideration" is what should have been received by petitioner, as administrator of the estate. A fiduciary is charged with the responsibility to obtain a fair and equitable price for the property. See S.D. Codified Laws, sec. 55-2-1 (1980); Robinson v. Roinstad,43 S.D. 436, 180 N.W. 67, 68 (1920); 2 Scott, Trusts 2d 170 (3d ed. 1967) (1959) and cases cited therein; Restatement, Trusts, sec. 170. Thus, although the record is replete with what the decedent paid for several items that were being contested and the record contains the fair market value of the farmland at decedent's death, we look to the parties' agreement to determine the value of this other consideration. We must conclude that the parties, especially petitioner in fulfilling his fiduciary responsibilities, knew best the value to be given to such other consideration. The parties would not have given up any more, nor would they have received any less than what they thought was fair considering all the *541 factors.
We therefore conclude that petitioner, as administrator, received what he was entitled to receive as heir and that the estate did not suffer a loss. In so doing, we are not rebutting the valuation of the farmland for estate tax purposes but merely holding that the estate received such value when the farmland was transferred for the cash amount of $134,000 and the other consideration generated by each party giving up his claims against the other. Because we conclude that no loss was realized, we do not have to decide whether the estate's loss [18] would be recognizable under section 172(d)(4) [19] or whether any potential loss could be carried over to the beneficiary succeeding to the property under section 642(h) [20] when an estate terminates with an unused net operating loss. *542 To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
*. By order of the Chief Judge, this case was reassigned from Judge Richard C. Wilbur to Judge Joel Gerber↩ for disposition. 1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years at issue, unless otherwise indicated. When a portion of land is referred to, the phrase "section of land" will be used.↩
2. Any reference to petitioner will be to Kenneth S. Kirsch.↩
3. The agreement provides in pertinent part: In consideration of the sum of One Dollar and other valuable considerations ($1.00) including the mutual benefits to be derived by the parties hereto, it is Agreed as follows: 1. The tenant [nephew] shall farm the real estate hereinafter described, and has in fact farmed the land for two (2) crop years already, and shall receive no compensation except hereinafter set forth. The owner [decedent] shall pay all expenses incident to said farming purposes. 2. As compensation for farming the land and the owner [decedent] receiving all of the crop, the tenant [nephew] shall, upon the death of the owner [decedent] receive, free of all encumbrances whatsoever, the real property described as follows: The Southwest Quarter (SW 1/4) of Section Twenty-two (22), Township One Hundred Seventeen (117) North, Range Fifty-two (52), West of the 5th P.M. and The North Half of the Northwest Quarter (N 1/ 2 NW 1/4) of Section Twenty-seven (27), Township One Hundred Seventeen (117) North, Range Fifty-two (52), West of the 5th P.M. and The North Half (N 1/2) of Section Twenty-eight (28), Township One Hundred Seventeen (117) North, Range Fifty-two (52), West of the 5th P.M. It is further agreed that the owner [decedent] will incorporate into his Will a provision whereby the said tenant [nephew] shall receive said land by inheritance upon the death of the owner [decident], free and clear of all charges and encumbrances, except death taxes, which will be covered in my Will.↩
4. Petitioner's wife was temporarily appointed as special administratrix of the estate of Fred Kirsch.↩
5. The complaint filed in the lawsuit alleged in pertinent part as follows: In the Spring of 1974, while Plaintiff [nephew] was a resident of the County of Codington, State of South Dakota, Plaintiff [nephew] and the said Decedent, Fred Kirsch, entered into a certain contract whereby the Plaintiff [nephew] was to farm some of Fred Kirsch's land and that the said Fred Kirsch would leave a Will leaving to Gene Kirsch [nephew] the real estate described in Exhibit "A" [the Memorandum Agreement]. It was further agreed that the owner [decedent] would pay all expenses of farming and that the said Fred Kirsch [decedent] would retain the crop. IV That on December 8th, 1975, the Defendant [decedent] and Plaintiff [nephew], entered into a written Agreement based on the oral agreement for farming of land owned by Fred Kirsch [decedent], said Agreement marked as Exhibit "A" [the Memorandum Agreement], is herewith attached and by this reference made a part hereof, as though the same again set out herein in full. ↩
6. On or about Oct. 15, 1976, nephew filed a claim in the probate proceedings in the Estate of Fred Kirsch, decedent, claiming $194,603.44 for custom work on the decedent's farm during the years 1971-1976 inclusive, for expenses advanced on behalf of decedent, such as wages paid to hired men and cattle purchased by nephew for the benefit of decedent. This claim was filed only as a contingent or a "backup" claim that would be asserted only if the action for specific performance of the agreement to make a will was not enforced by the state court. Nephew also filed an amended complaint on July 6, 1978, with respect to 140 head of cattle and certain machinery, whose ownership was also in dispute.↩
7. Petitioner in this case filed the amended answer and counterclaim on Jan. 24, 1978. The farmland in question that decedent allegedly did not own and accordingly could not convey to nephew included gravel property sold in the southwest quarter of section 22 of the land and the northwest quarter and the north half of the northeast quarter of section 28 of the land. In addition, except for the steel grain bins, corn crib, and cattle shed, decedent did not own the north half of the northwest quarter of section 27 of the land and the south half of the northeast quarter of section 28 of the land because nephew (through his father) already owned such property as of Mar. 5, 1976 (with respect to section 28 of the land). The nephew's father owned the property as of Feb. 7, 1948.↩
8. These 10 acres were sold to Hallett Construction Co. for removal of sand pursuant to an option granted by decedent for $750 per acre. ↩
9. These 25 acres were subject to an option to purchase at $500 an acre in favor of Hallett Construction Co. that would expire in 1982. A notation on the Federal estate tax return explained that it was uncertain whether the option would be exercised. The gravel was supposedly of poorer quality. ↩
10. An explanation on the Federal estate tax return provided that the gravel content probably was not sufficient to warrant expectation of sale for such purpose and was not very good farmland.↩
11. The note on Schedule J of the estate tax return specifically stated: Note: Gene Kirsch, nephew of decedent, has filed a claim against the estate of the decedent for custom work and expenses advanced for the decedent of $194,603.44. The Administrator believes the claim has no merit and the claim is being resisted. If the claim is allowed in whole or in part, refund will be claimed. Refund may not be appropriate, however, see note 16, infra.↩
12. The pertinent part of the stipulation between the litigants in the state lawsuit with respect to these 105 acres recited: 4. Defendant [petitioner in this case] will sell Plaintiff [nephew] under a Contract for Deed for a term of 20 years with equal annual payments plus interest at 8 per cent per annum from and after July 20, 1978, with the first payment to be on December 1, 1979, and with the purchaser [nephew] having the right of prepayment, the sale amount being fourty-four [sic] thousand dollars, said property being described as all of the property owned by the Defendants [petitioner in this case and decedent's estate] consisting of 105 acres described as: the North Half (N 1/2) of the Northeast Quarter (NE 1/4) of Section Thirty-three (33), and the North 25 acres of the Southwest Quarter (SW 1/4) of the Northeast Quarter (NE 1/4) of Section Thirty-Three (33), Township One Hundred Seventeen (117) North, of Range Fifty-two (52), West of the Fifth principal meridian, Codington County, South Dakota.↩
13. The value on the estate tax return was $51,850 for the 122 acres, $144,000 for the 240 acres, and $43,000 for the 115 acres for a total of $238,850. Pursuant to the stipulation in settlement of the lawsuit, nephew did not receive any land in section 27 of the land although the Memorandum Agreement specified that nephew was to receive land in this section of the land. Nephew did not receive any land in this section because he already owned the land (through his father, Chris) although there was a controversy over who owned the steel grain bins, corn crib, and cattle shed located on the property. Even though the Memorandum Agreement specified that nephew was to receive 160 acres in section 22 of the land, nephew, pursuant to the agreed stipulation, only received 122 acres decedent owned and reported on decedent's Federal estate tax return, valued at $51,850. Similarly, with respect to section 28 of the land, the Memorandum Agreement specified that nephew was to receive 320 acres but all that nephew received, pursuant to the stipulation, was the 240 acres reported on decedent's estate tax return, valued at $144,000. Conversely, the Memorandum Agreement did not specify that nephew was to receive any land in section 33 of the land; yet, pursuant to the stipulation agreement, nephew received the 115 acres that decedent reported on the estate tax return, valued at a total of $43,000. ↩
14. It is not clear whether petitioner is claiming the loss because he owned all the property or whether he is claiming the loss of the estate because he is a beneficiary succeeding to the property.↩
15. Sec. 29-1-2 of S.D. Codified Laws Ann. (1976) provides: The property, both real and personal, of one who dies without disposing of it by will, passes to the heirs of the intestate subject to the control of the circuit court for the purposes of administration, and to the possession of any administrator lawfully appointed. All such property shall be chargeable with the expenses of administration, the payment of decedent's debts, and the allowance to his family, except as otherwise provided in this code.↩
16. Because this is not a case relating to the estate tax consequences, we need not decide whether the estate may deduct the "claim" under sec. 2053. A distribution that a relative or beneficiary of the decedent has a right to receive from the decedent's estate is not deductible under sec. 2053(a)(3) even if the right is characterized by local law as a claim against the estate. Compare Estate of Lazar v. Commissioner,58 T.C. 543, 550 (1972) (distinguishing between a claim to share "in" the decedent's estate and a claim "against" the estate to hold that a payment made in a will contest to compromise a claim to share "in" decedent's estate is not deductible), with Pennsylvania Bank & Trust Co. v. United States,597 F.2d 382 (3d Cir. 1979), cert. denied 444 U.S. 980↩ (1979) (payment to settle will contest not deductible as administration expense, even though the payment spared the estate an expensive nuisance suit). 17. Title vests immediately to the heirs subject only to the control of the county court for purposes of administration. The decree of distribution vests or grants no title but merely releases the property from probate and confirms the title already passed to the heirs or beneficiaries. Kellar v. Kasper,138 F. Supp. 738, 741↩ (W.D.S.D. 1956). We believe that title is not dispositive of whether a loss was realized, however.
18. Courts have held that where representatives of an estate have been involved in serious litigation concerning claims made against the assets of the estate from the date of decedent's death, the estate is not considered closed for Federal income tax purposes. Wylie v. United States,281 F. Supp. 180, 189 (N.D. Tex. 1968); Miller v. Commissioner,39 T.C. 940, 948 (1963), affd. 333 F.2d 400, 402 (8th Cir. 1964); Stewart v. Commissioner,196 F.2d 397 (5th Cir. 1952); Stephenson v. Commissioner,33 B.T.A. 252, 258 (1935); sec. 641(a)(3); sec. 1.641(b)-3(a), Income Tax Regs.↩ When the litigation ends, the estate is considered closed. 19. Sec. 172(d)(4) allows a deduction otherwise allowable but not attributable to a taxpayer's trade or business. For purposes of sec. 172(d)(4), gain or loss shall be treated as attributable to the trade or business if the gain or loss results from the sale or disposition of depreciable property or real property used in the trade or business. In addition, sec. 1.172-3(a)(3)(ii), Income Tax Regs., provides: a farmer who sells at a loss land used in the business of farming may, in computing a net operating loss, include in full the deduction otherwise allowable with respect to such loss, without regard to the amount of his nonbusiness income and without regard to whether he is engaged in the trade or business of selling farms. [Emphasis supplied.] As stated in the text, we do not have to decide whether the estate was in the business of farming. ↩
20. Sec. 642(h) provides, in pertinent part: (h) Unused Loss Carryovers and Excess Deductions on Termination Available to Beneficiaries.--If on the termination of an estate or trust, the estate or trust has-- (1) A net operating loss carry-over under section 172 * * * or (2) for the last taxable year of the estate or trust deductions (other than the deductions allowed under subsections (b) or (c)) in excess of gross income for such year, then such carry-over or such excess shall be allowed as a deduction, * * * to the beneficiaries succeeding to the property of the estate or trust. Thus, when an estate terminates and has a net operating loss carry-over which would have been available to the estate in later years except for the termination, the carry-over is allowed to the beneficiary succeeding to the property of the estate to the extent that the net operating loss is not absorbed by the income of the estate's carry-back years. See also secs. 1.462(h)-1 and 1.642(h)-2, Income Tax Regs.
An estate, like an individual, is entitled to losses from a trade or business. Sec. 642(d). See also, e.g., sec. 165(c); secs. 1.162-12, 1.165-6(a), Income Tax Regs. It is important to note that a loss of decedent during his lifetime may only be claimed on decedent's final tax return because decedents and their estates are different taxpayers. Sanburn v. United States,74 F. Supp. 894, 895 (D. Mass. 1947); Estate of Hoffman v. Commissioner,36 B.T.A. 972, 973-974 (1937). On the other hand, a loss of an estate may be carried over to the beneficiaries to the extent that the net operating loss is not absorbed by the income of the estate's carry-back years. Nemser v. Commissioner,66 T.C. 780, 783 (1976), affd. without published opinion 556 F.2d 558 (2d Cir. 1977), cert. denied 434 U.S. 855 (1977); sec. 642(h)(1); secs. 1.642(h)-1 and 1.642(h)-2, Income Tax Regs.↩